on our agenda, it concerns me when I see somebody walking up with boxes that size in a pellet argument. It concerns me too, Jay. It concerns me that one thinks that you might be able to use those in your 15 minutes so we're going to have to be very careful. We're going to call the next case in Re Paulsboro Derailment Cases and the first counsel to recognize is Mr. Cooker. I'm Mark Cooker, I represent the plaintiff appellant Alice Freeman and I'd like to reserve two minutes for rebuttal. That request will be granted. My argument is going to focus on three points. The first two will be to answer the court's two questions on preemption and jurisdiction. The third will be to explain why the trial court's exclusion of Dr. Osanugi's testimony should be reversed because there were no facts in the record to support the lower court's findings. On preemption, 49 CFR 242.119 did not even exist when Wilbert Dinaldo was initially trained as a conductor in 2009. We realize that training was negligent because they didn't explain to him that the locks on the Paulsboro bridge need to be fully engaged for the train to be safe to cross the bridge in the face of a red light. If they were only partially engaged, then the vibrations of the bridge could cause the locks to disengage and then a catastrophe could happen. Mr. Dinaldo did not know that. Since the regulation did not even exist, quite clearly it doesn't cover the subject matter of the claim and it cannot be preemptive. On the date of the incident, 242.119 did exist, but it did not take effect as to Conrail. Conrail's own brief at page 60 admits it did not take effect until April 1, 2013. Again, if the regulation does not take effect as to Conrail, it does not cover the subject matter so as to be preemptive of the claim. In this area, we look to preemption quite broadly. And when we've got large swaths of the CFR that are addressing qualification and certification of locomotive engineers and conductors, including requirements about completion of training programs, why doesn't that meet the standard of covering the subject matter? Well, first of all, we're not talking about 240. We're talking about 242. 242 was not yet in effect. Secondly, the court does not look at preemption broadly. This court's decision, N.D. Wall, said the term cover is a restrictive term, and the regulation has to more than relate to the subject matter or touch on the subject matter. It has to subsume the subject matter. Now, none of these requirements you're talking about were in effect on November 30, 2012, as to Conrail. Had this accident happened six months later, you know, I don't really know what you mean. But as of November 30, 2012, there were virtually no training requirements for conductors. And let's talk specifically about the kind of training we're talking about. You can view it narrowly and say it's training a conductor on how to inspect a movable bridge, and you can come back at me and say, well, you can't be too narrow. That's not fair. But if you look at it as most broadly, it's training a conductor on the physical characteristics of the territory. There were no regulations in effect whatsoever on the date of this incident as to how to train a conductor on the physical characteristics of the territory. And that's looking at it most broadly. So that can be preemptive. Now, what was in effect, and it goes to training on the physical characteristics of the territory, was Conrail had created, under Chapter 242, excuse me, had created a program for training conductors. And that program, which was in effect, said if you're absent from a line for over a year, and you go back on the territory, you need to be re-familiarized with the territory. You need to be provided with assistance, a conductor's assistant, job aides, meet with the operations supervisor. All those things should be done. None of them were done with regard to Mr. Den Alban. He was off the line for over a year. He went back. He was not given any assistance. He was as ignorant on Day 3, his Thursday nap on the line, November 30th, as he was on Day 1. Don't they only say that that additional training is necessary if the supervisor deems it to be necessary? Well, that is as to part of it. But the other part, I think I'm going to have to get out, I will get out the language. The other part said he incorporates 242.301. Well, let me start right there. It says he's supposed to meet with the operations supervisor. He didn't, period. So the operations supervisor didn't meet with him and didn't make any determination. That's the first thing. The second thing is that it also says that he is to be provided with a conductor's assistant who is not the engineer. And I believe, and I'll find the language in my, I know it's quoted in the brief, that is mandatory. If I could find it. We only reach this issue if that evidence comes in, right? This relates to the motion for reconsideration. I'm sorry. I didn't hear. We only reach this issue if that evidence even comes in. This is relating to the motion for reconsideration. Yes, it did, and the reason we didn't know about it is it wasn't provided to us. It was literally a missing page. But it was eventually obtained, and maybe you could address the threshold question about whether it was reasonably diligent not to have requested it earlier through a FOIA request. Well, I think the law is that you can rely on what the Fed has produced to you in discovery. And in this particular situation what happened was when Conrail submitted its motion, it attached a completely different program. It actually attached a 2009 program, which didn't apply at all. We eventually found the 2012 program, but that was missing the page, and it was the missing page that contained the relevant information. Here's the language. For a conductor who is previously qualified but who has not regularly traversed the territory once in the prior 12 months, will be assigned a crew member other than the locomotive engineer who meets the territorial qualifications. So that's mandatory. He should have been assigned a crew member. What about the question of subject matter jurisdiction as it relates to the bringers? Sure. We don't think Huber changed the law. The law is it must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal. I don't think the legal impossibility language of Huber is any different from that. What Huber shows is how hard it is to meet that standard because the failure to prevail on the merits of a claim because of inadequate evidence is a subsequent event which does not destroy jurisdiction. It is not a subsequent revelation which does destroy jurisdiction. And Huber said it's a mistake to look at the record as it exists after dismissal of claims. You have to look at the record ab initio. Now, if you look at the facts of this case compared to Huber, this is a much stronger case for finding the jurisdictional amount is there. In Huber, there was a liquidated damage claim that matched the $13,000. Ultimately, the court found there's no actual damage. Here, there's no question Alice Friedman had actual harm. She was heavily exposed to toxic chemicals. She had a chronic cough so violent it damaged an abdominal nerve. She had a pulmonary function test that was only 34% of predicted. There's no question that vinyl chloride is a known human carcinogen and she had a substantial exposure to it. New Jersey Department of Health has said there may be no safe level of exposure to a known carcinogen. And with regard to this specific event, the Department of Health said it may be reasonable to estimate that the added cancer risk from this exposure may have exceeded 1 in 10,000. That is greater than the added cancer risk that this court found in Paoli was sufficient to sustain a medical monitoring claim. So you're saying that there was a legal basis at the time this complaint was filed? Yes, and that the fact that the court wrongfully, we believe, excluded a medical causation expert under Rule 702 doesn't take away jurisdiction. It is a subsequent event similar to the dismissals and the granted of self-rejection that took place in the Huber case. Ruling that it is a revelation would mean, essentially, this court, any time a medical causation expert is excluded, there would be no appellate revealed. Because the court can then say, well, we just revealed there's no causation. But there's no question she had a significant injury. The dispute was whatever caused it. Also, on the punitive damage issue. Can you get over the 75,000 without punitive damages? I think we can. I think the fact that she had a chronic cough that was so severe, that she had a pulmonary function test only 34% of predicted, the fact that she had exposure to a carcinogen in the Department of Health, thought there was an increased risk of cancer, justified a fear on her part of cancer. That was sustained. But I do want to talk about punitives. In Huber, the court said an allegation of intentional fraud was sufficient to sustain jurisdictional punitives, even though it was dismissed. Here, Conrail deliberately drove a train loaded with hazardous chemicals, threw a red light across a bridge, would have 23 prior complaints, at least 23 complaints that it was not operating properly, knowing the bridge hasn't fixed. Based on the word of a conductor who was never formally trained and his proficiency was not tested on how to do this. So we think that is sufficient basis for a good faith claim for punitive damages. On the issue of Dr. Osamubi, if I may have the court's indulgence. Go ahead, finish. The court said she did no systematic research to support her opinions that hydrochloric acid caused Mrs. Brigham's persistent respiratory problems. That opinion, none of Dr. Osamumi's opinions on hydrochloric acid were even challenged by the defense experts. It wasn't even mentioned in their report. It wasn't mentioned in their briefing. At the Doberman hearing, one of the defense experts suddenly testified that he reviewed her research on hydrochloric acid and it was inadequate. On close examination, he admitted he reviewed it for the relationship between hydrochloric acid and cancer, which was not even a claim in the case. He did no review of the relationship between hydrochloric acid and respiratory conditions. He didn't read a single article cited in her report. Secondly, the court said she did not use any methodology in reaching her conclusions. She did use a methodology. She found biological plausibility. She found substantial exposure. She found temporality. We expound on that more in our briefs, but the methodology she used has been specifically accepted by the Reference Manual of Scientific Evidence and by this court in the Conankerall case. Okay, Mr. Cook. Thank you. We'll have Mr. Lang. Thank you, Your Honor. Good afternoon. May it please the Court, Matthew Lang from the law firm of Chance & McCann, on behalf of appellants Everingham, Johnson, and Ragon. Our argument is fairly simple as far as the jurisdiction to these three particular plaintiffs, which is this court did not have jurisdiction until March 21, 2016, because there was not a final order entered until March 21, 2016. So it is axiomatic that we could not possibly have exhausted our appellate rights before the appellate court had jurisdiction. There is a slightly more, and I think that's very clear with Everingham and Ragon, because they shared a docket with multiple plaintiffs, and those plaintiffs, their claim did not. But Johnson did not. That's correct, Your Honor. And the issue with Johnson, I think, goes to the Bergman case. The Bergman case looked at whether or not a consolidation order effectively invokes Rule 54B. Now, admittedly, the progeny from Bergman will consistently show that there must be some type of comprehensive consolidation order before Rule 54B is going to apply. But I think Bergman also stands for the idea that there should be no bright-line rule. And I think that this Court was very clear in Bergman when they said that this must be looked at in a case-by-case basis, and that there cannot be a bright-line rule. And even the progeny, when you look at the cases cited by the defense, the progeny also reiterates this fact that everything is case-by-case with no bright-line rule. Bergman mentions a prior case, which is Boghossian, which outlines some factors that this Court should examine before you determine whether or not a consolidation order is going to invoke Rule 54B. And I think all of those factors apply except for the consolidation for trial purposes, which is everyone, Johnson, Ragone, and Everham all had the same attorney, which is us. They all had the same claims. The defendants were all the same. The orders that we're appealing from were all the same. Everything is essentially identical. The only difference is the name of the particular plaintiff. When you take that into consideration, to require Mr. Johnson to appeal, immediately upon the entering of summary judgment would be a piecemeal appeal, which this Court does not endorse. He would have to appeal, and then once Everham and Johnson's cases were final several months later, they would then appeal essentially the exact same issues against the same defendants. And as a piecemeal appeal, that's exactly what Rule 54B is. You represent them all here, obviously. Did you represent them all in the District Court? Yes, Your Honor, I did. Our firm did. My partner did some of the work. I did as well, yes. Was there separate counsel for Johnson? There was not, Your Honor, no. Okay. Thank you, Your Honor. Sorry, just one question. If you're suggesting that when cases are not consolidated for all purposes and we have a final judgment in one of those cases where we shouldn't treat the timeline or the failure to meet the regular deadline as mandatory and jurisdictional, what is the test? When would we evaluate in the scheme you're proposing, under what circumstance would we say it is timely when there is a final order in a case that has not been consolidated with others for all purposes? I think in a circumstance like this one, Your Honor, where all of the claims are the same, the attorneys are the same, the defendants are the same, and the issues on appeal would be the same, I think it's when all of those plaintiffs and all of their claims have been disposed of. I think that's when the clock starts to run on the timeliness of an appeal. Is there any authority, any precedent where we have taken an approach like that or other courts of appeals have for that matter? Admittedly, no, Your Honor. Thank you. Thank you. Thank you, Mr. Wein. Ms. Winkleman. Thank you, Your Honor. I'm Nancy Winkleman for Appalese, and we appreciate the court's focus letter as set forth in our Division of Time form. I am going to argue eight minutes on the jurisdictional issue, and my colleague Ron Ray is going to argue seven minutes on the preemption issue. We have some points of agreement with appellants. One is we are in agreement as to on the appellate jurisdiction issue, the first issue that the court raised in its focus letter over the first responders, we agree that there is appellate jurisdiction over the McGowan and Everingham appeals, so that doesn't require further discussion. We disagree on the Johnson appeal, and we certainly disagree on the reading of Bergman. For one thing, counsel for the first responders today argues as if it's only his three clients and those three cases that were consolidated for case management and discovery purpose in the district court. In fact, all the Paulsborough personal injury derailment cases were consolidated for discovery and case management purposes. And so under Bergman, the only way that Johnson's appeal could be timely would be if this court would, I would submit, go in a different direction than all the post-Bergman, the Boghossian, the post-Bergman precedent, and say that a case that's, you know, consolidated only for case management and discovery purposes, in fact, become one judicial unit, even though they're not consolidated for trial, they become one judicial unit with all the cases. That's just not the law of this circuit. And in fact, considering the factors that underlay Bergman, the Boghossian kind of case-by-case factors, the complaints are not identical. And again, we need to look at all the cases, all the Paulsborough derailment cases, because that's what, those were all that were, they were all consolidated for case management and discovery, not trial. The complaints are not identical. The attorneys are not identical. We've seen two different attorneys here today, and there are more. They're different plaintiffs with different injuries. The cases would not have been tried together. And in fact, one tried together, one of the cases, the Morris case, which this Court has stayed, was tried separately. So we agree on the appeal of jurisdiction as to the two plaintiffs, but disagree as to Johnson. That's an untimely appeal. With respect to subject matter jurisdiction, I want to just frame this argument with three guiding principles that have helped me march my way through it. One is that, of course, a district court has the unflagging duty to assess its jurisdiction at all times, and not just as of the filing of the complaint, as my colleague suggests, but as the proofs develop, even after trial, the operative language from the seminal case St. Paul in the Supreme Court, if from the proofs, so it's not just that subject matter jurisdiction is determined as of the time of the complaint. The second broad principle that I think frames this Court's analysis of subject matter jurisdiction is that, although it is true that the Court's review is plenary, and that's important, the findings of fact of the district court, which I'll get to in just a moment, are reviewed for clear error. And in fact, there is some discretion given to a district court, certainly like this one, who has lived with 250 cases, a very unique, broad, comprehensive, very active case management situation, looking at each of these cases. Judge Aldister, in the Nelson case, which was really this Court's first, and I would suggest most on point to this day, consideration, wrote, we have no difficulty in concluding that Congress intended that trial judges exercise permissible discretion prior to trial in adjudicating challenges to jurisdiction. And that's exactly what we want district court judges to do. That's exactly what this district court judge did. My last broad principle is the burden of proof, of course, rests with the plaintiffs. We agree with counsel for appellant that Huber did not change the law in this area to address the Court's specific question, didn't modify third circuit case law. For one most basic point, it couldn't have. But in any event, although the Court in Huber does use, at one point, the legal impossibility language, it also uses the legal certainty language, which has been this Court's established test. And I would direct the Court to page 246 of the Huber opinion, where it uses legal certainty, says legal impossibility at 247, but this Court could certainly reconcile Huber by saying that legal impossibility language, if it even makes a difference, and I have to tell you that I've been trying to play with that in my own head a little bit, is dicta, is perhaps inartful writing, and certainly if there's any question about it, it should be read to reconcile with the third circuit precedent. Even if we saw it as a subsequent revelation that given the actual pleadings, given the facts that are asserted or not disputed by the plaintiffs, and given governing state law, the cumulative damages could not be awarded as a matter of law. And Huber seems to anticipate that type of claim as one of the legal impossibility. But if what we're talking about is also components that involve rulings by the district court, rulings on credibility or rulings on admissibility of expert testimony that go to the existence, for example, of emotional distress damages or medical monitoring damages, why isn't that simply the type of subsequent event, the rulings in the course of a case that we take as part of the life cycle of a case, not something that retroactively deprives a district court of jurisdiction? You're exactly right, Your Honor. And if that's what the district court had done here, there would be a different issue. But the district court, and I commend the district court's transcript of the Show Cause hearing, it's at JA 5589-5617 to this court, Judge Kugler meticulously, carefully went through each element of damages, not based on his rulings on medical monitoring, fear of cancer, emotional distress, whatever, but based on exactly what a district court should do. He said the facts as to the briefings never changed from the date of the derailment to the date of the filing of the complaint to the date the court decided certain motions. So it wasn't the court's own subsequent events that it says, okay, now you can't meet the amount of controversy. The court was very careful to say nothing changed. Nothing changed. The compensatory damages didn't change. They were minimal, minimal. Ms. Freeman's alleged injuries were dizzy, tired, coughing. These were revelations. What was revealed was what existed as of the date of the complaint. And unless we're going to confine a district court to the allegations as pled, which is contrary to Supreme Court precedent, contrary to this court's precedent, we want a district court continuously to be looking at its own subject matter jurisdiction, continuously to be looking at what is revealed, not based on his rulings, but based on the facts that existed at the time of the complaint. Wouldn't those figures, wouldn't the damages be different had the district court ruled differently as to experts in discovery? That may be true, but that doesn't mean that the district court based its subject matter jurisdiction ruling on its other rulings. Clearly, there's some place where the merits rulings and the jurisdictional rulings, they're not as clean as in some of the other cases. I accept that. I acknowledge that. But Judge Kluge here was very careful to say, I'm not considering my rulings. I'm considering the compensatory damages as they existed at the time of the complaint. I'm considering the fact that there is no legal basis under New Jersey law for plaintiffs to recover medical monitoring or fear of cancer damages. Isn't that, that's after the conclusion that Judge Kugler made on the legal basis of those particular claims. Judge Fischer, I want to answer a question. I want to be sure I'm not bleeding into my colleague's preemption time also, because obviously that's important. That's okay to answer if you would answer the question. Yes, obviously. He wasn't, he was very careful himself to separate the two, to put the two into two separate boxes and said, I'm not basing this on the merits of my claims. I'm basing it on what was revealed to me through the proofs that existed, didn't change from the filing of the complaint until there was no subsequent event that changed. It was, here are the facts that existed as of the time of the complaint. What has been revealed to me is the very minor nature, very minor nature. Even plaintiffs themselves at, I think it's JA, I'm sorry, 5594, essentially conceded that they couldn't get to 75,000 on the basis of compensatory damages. Very, very minor physical injuries. They then, you know, they need other buckets. They needed the medical monitoring of fear of cancer, which were not available as a matter of law. They needed, as Your Honor referenced, punitive damages. The district court made findings of fact to which this court must accept unless they were clearly erroneous. If we find that they were clearly erroneous as to what existed at the time of the filing of the complaint, then we could disregard them. Well, Your Honor, that is true, but the factual findings are important because they couldn't possibly give rise to punitive damages. The district court found there's no dispute that the Conrail employees thought the bridge was locked. Plaintiffs presented no evidence that Conrail was aware of the problems and didn't care. No dispute about what Conrail did in response to the trouble tickets. Plaintiffs would need those punitive damages to get even near the 75,000. The district court made factual findings that they couldn't possibly get there. It just didn't come near the very high and strict standard of the New Jersey statute. Why isn't there enough, or at least for it to be a close question on compensatory, when what we're dealing with in terms of fear of cancer and the emotional distress that's caused relate to not just an adult, but also to children and a very young child? Couldn't that be a pretty large damage award given analogous tort types of claims and claims in the employment context as well? Well, we're talking about toxic tort claims, so I think it's very important for the court to confine its inquiry to that type of claim. And there was simply no, what the proofs revealed was the injuries were very minor, that the fear of cancer as a matter of the law was not compensable under New Jersey law because no reasonable person could fear cancer based on very short-term exposure to vinyl chloride. There was simply no basis for that. And the district court, that's what was revealed, that the compensatory damages, the physical damages were very minor, that as a matter of law the emotional distress damages would not be recoverable. And as a matter of fact, based on the factual findings that were revealed during discovery, claims could not come close to the New Jersey standard for punitive damages. And for those reasons, we believe the district court was correct at the end of the day, based on what was revealed, to determine that it lacks subject matter jurisdiction. Okay, Ms. McGlynn, we'll call on Mr. Ray to discuss the issue of preemption. Thank you, Your Honors. Mr. Ray. Thank you, Your Honor. May it please the court. As the court will no doubt detect from my accent, I'm not from this neck of the woods, so it is my distinct pleasure to travel north to be with you today. My task, as Ms. Wickleman alluded to, is to address the issues of preemption. As the party's briefs make quite clear, every court of appeals that has looked at the issue of whether negligent training claims are preempted by the federal regulations have concluded that they are, in fact, preempted. As the Indian Pacific case perhaps said it best, it is clear that the federal regulations do substantially subsume the subject of employee training. This court's more precise question in the letter that you sent, and we appreciate that, was the preemptive effect of the regulations as a whole, and more specifically 242.119. As to 242.119, perhaps due to the newness of that regulation, we were unable to look at any case, and appellants certainly cited no case dealing with that regulation specifically. But I think the answer to the court's question of whether that regulation has preemptive effect is clearly yes, and I say that for a couple of reasons. First, Part 242 is modeled after and substantially the same as Part 240, which every court which has looked at the issue has held does have preemptive effect, the only difference being, of course, that Part 240 focuses on locomotive engineers while Part 242 focuses on conductors. But in terms of the substance of the regulations, the training requirements, the other elements that go into determining who is a qualified and who is a trained employee to perform the functions of a locomotive engineer under 242, or conductor under, I'm sorry, locomotive engineer under 240, or conductor under 242, the regulations are essentially the same. Additionally, both regulations go hand in hand and are complementary to the regulations found in Part 217, and the cases which have looked at this issue of preemption of negligent training claims have all looked at the relationship between those two regulations, 217 and 240, or in this case, 242, and have noted that, again, it's the comprehensive nature of the regulations which provides that they do substantially subsume the issue of employee training. Well, we don't have a specific regulation on covering training of conductors for bridge crossings. In your efforts to distinguish the Ziegler case from the Georgia Supreme Court, are you accepting the premise that there needs to be a regulation that's specific for there to be preemption? No, certainly not, and I think your question earlier to Mr. Coogler stated the issue correctly. You look at the regulations as a whole, and the Doyle Court, which took the language from Easterwood, made very clear that preemption does not depend on any one specific federal regulation being directly on point or identical to the claim being presented. What we do when we look at whether a claim is preempted is we look to the nature of the claim, and in this case, the state law claim they sought to pursue was a claim that the crew members were not properly trained and qualified. Then we look and see are there federal regulations that cover that subject matter, and the answer is clearly yes. 217, 240, and 242 all specifically define who is qualified, and they set forth the training that is required to be provided to these crew members. So once you reach that issue and you see that the federal regulations do cover the subject matter or the same subject matter as the state law claim, then it is preempted, and it does not matter that there is not a specific training requirement on movable bridges. The Union Pacific case is the best example I can give you of that. In that case, California tried to say we think that locomotive engineers need additional training. They had some steep grades in the state, and they said we want to pass some state regulations that require additional training on that subject matter because the federal regulations don't deal with that specific issue, and the Ninth Circuit said that cannot stand. That claim is preempted, and it doesn't matter, as appellants argue in this case, that you contend that the regulation is inadequate or that you contend additional training would have been necessary. The question we look at for purposes of preemption is do the regulations cover the subject matter, and once they do, then the claim is preempted. And so, again, every appellate court that has looked at the issue has agreed with that, and every district court case cited by the parties have agreed with that. To talk just one step further on sealer suits. They make the point that the regulation at issue was not effective as your client on the day of the accident. Do you agree with that, and if so, how does that play into the analysis? Well, I'll start with the second part of the question. I think it has no effect on whether or not the regulation has preemptive effect, which was the question this court asked, but the effective date of the regulation. Well, can it have preemptive effect if it doesn't apply to your client? It can when you're looking at the overall scheme and the purpose behind the regulations. I think it informs the court's judgment as to what was intended by 240, 242, and 217 and how they relate together. But in this case, to get to the first part of your question, 242.119 and the other regulations in 242, Conrail is not required to begin training its employees on those regulations until April of 2013. And so that date to begin that training program, and then they had three years to fully implement the program and to take care of getting everybody fully qualified under the 242 regulations. But the question that we're looking at for preemption, again, is how does the scheme as a whole fit together? And so it may be somewhat of an academic question here, because Mr. DenAllen and Mr. Mather were unquestionably trained under 217 and 240, which their own experts conceded. And those regulations have been held by every court to look at the issue to have preemptive effect. So preemption applies either way. But if the question is, does 242 have preemptive effect, it absolutely does, and it should. I see I'm just about out of time. I'll be happy to answer any other questions. Can you address the motion for reconsideration point? And specifically, if we were to say that they're not in a position to hold up that standard because they weren't reasonably diligent in obtaining it, is that rewarding gamesmanship and discovery, where it should have been turned over in response to a discovery request? I certainly don't think it's rewarding any type of gamesmanship, nor was there any gamesmanship. There was an honest mistake, as the district court acknowledged in attaching an incorrect document. But that was obvious for all to see. It could have been raised earlier. But more importantly, I want to talk to the document and the issue that they raised by that deals with territorial qualifications of employees. That is a different subject matter from training. And the motion that we filed and the ruling from the district court was that training claims are preempted. And that never changed. Nothing in the record ever changed as to the training given to these gentlemen under 217 and 240 and then later 242. The only thing they argued on the motion for reconsideration is, well, now we found this document that says that you weren't territorially qualified. Well, as the FRA made clear, and both parties cited the FRA guidance on territorial qualifications, and they say very plainly in that document, you can be fully trained but not be territorially qualified. Those are two separate issues. So I don't think it had anything at all to do with the merits of the court's ruling. It certainly wouldn't warrant reversal. I did, if I may, I did want to speak to your question about Ziegler because I forgot about it and wanted to come back. Ziegler, of course, as this court is aware, was a FVLA claim. And so it really was not a preemption issue at all. It was a question of whether one federal statute, the FVLA, could be precluded by the FRSA. And so I don't think Ziegler has any authority whatsoever with this court. And when you look at the preemption cases, they're all very clear that the regulations do preempt. And Ziegler simply said that under the railroad's duty to maintain a reasonably safe place to work, one of those requirements might be a requirement to train employees on how to deal with grain crossing accidents and preventing injuries because that is a circumstance in which a railroad employee might find himself or herself. It had nothing to do with who is trained and qualified to do the job of a conductor or engineer, which is the subject matter covered by 217, 240, and 242, which is why those claims are preempted here. Okay, Mr. Waring. Thank you very much for your argument. And we'll call Mr. Goger back for a rebuttal. Mr. Waring, the state of the Union Pacific case, the state of California, had two regulations dealing with Chapter 217 training on the company rules. The Ninth Circuit ruled that one was preempted and ruled the other wasn't. The regulation that was not preempted was a regulation that required the railroad to have its company rules approved by the state of California. The Ninth Circuit said that's not preempted because all 217 says is you should have company rules and follow them with the FRA. They don't regulate the content of the company rules at all. Therefore, California could regulate the content of company rules. That showed that preemption was actually far narrower. As to 242.119, if that was in effect on the date of this incident, Conrail violated it. It required the training be formal, be documented, and the proficiency of the conductor be tested. Mr. DenAllen's training was not formal, not documented, and quite obviously his proficiency on inspecting this bridge was never tested. They want to have it both ways. They want to say it doesn't apply but is preemptive anyway. That makes no sense. What the FRA did was they had an unregulated regime, which they phased into a regulated regime effective April 1, 2013. This was not effective, was not preempted before 242 was written. It could not be preempted until 242.119 fully took effect. The FRA could only have intended, okay, we're not regulating it. We're giving you fair warning. You're going to have to do a lot of stuff. You're going to get your ducks lined up. But this doesn't become final and effective until April 1, 2013. It simply cannot cover the subject matter if it doesn't regulate the subject matter. That's all I have. Thank you, sir. And we thank all counsel for their arguments and briefs in this case. An interesting case. We'll take the matter under advisement. Any other thoughts? Okay.